**COMMONWEALTH of Pennsylvania,
Appellant,**

v.

**Delroy PHINN, Appellee.**

Superior Court of Pennsylvania.

Submitted June 26, 2000.
Filed Oct. 16, 2000.

David W. Lupas, Asst. Dist. Atty., Wilkes-Barre, for Commonwealth, appellant.

Demetrius W. Fannick, Kingston, for appellee.

BEFORE: CAVANAUGH, DEL SOLE and MUSMANNO, JJ.

CAVANAUGH, J.:

¶ 1 The Commonwealth appeals from the trial court's order of suppression.[1] We affirm.

---

1. The Commonwealth has included a certification in its notice of appeal that the suppression order effectively terminates or substantially handicaps its prosecution, satisfying the requirements of *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382, 386 (1985) and Pa.R.A.P. 311(d), 940(e).

■ ¶ 2 We must first determine whether the issues raised by the Commonwealth are properly before us. On January 3, 2000, the court directed the Commonwealth to file a statement of matters complained of on appeal within fourteen days pursuant to Pa.R.A.P.1925(b). The Commonwealth's statement, filed on January 19, 2000, appears to be untimely and the trial court did not file a Rule 1925(a) Opinion in this matter. Under *Commonwealth v. Lord*, 553 Pa. 415, 719 A.2d 306 (1998), the failure to timely file a 1925(b) statement of matters complained of on appeal results in the waiver of those issues for purposes of appellate review. The rule announced in *Lord* has been strictly applied by our appellate courts. *See In Re Estate of Daubert*, 757 A.2d 962, 2000 PA Super 219, ¶ 3 (August 3, 2000) (citing *Commonwealth v. Steadley*, 748 A.2d 707 (Pa.Super.2000), *Giles v. Douglass*, 747 A.2d 1236 (Pa.Super.2000), *Commonwealth v. Ortiz*, 745 A.2d 662 (Pa.Super.2000), and *Commonwealth v. Overby*, 744 A.2d 797 (Pa.Super.2000)).

¶ 3 The court's order of January 3, 2000, directing the Commonwealth to file a statement was docketed that same date by the clerk of courts pursuant to Pa. R.Crim.P. 9025 which provides, "Upon receipt of an order from a judge, the clerk of courts shall immediately docket the order and record in the docket the date it was made." Rule 9025 further requires the clerk of courts to "forthwith furnish a copy of the order, by mail or personal delivery, to each party or attorney, *and shall record in the docket the time and manner thereof.*" (Emphasis added). Pa.R.A.P. 108(a) provides that the date of entry of an order shall be the day the clerk of courts "mails or delivers copies of the order to the parties."

¶ 4 The instant docket contains no information regarding when or how the court's order was furnished to the Commonwealth. Assuming the clerk of courts mailed or personally delivered a copy of the order to the Commonwealth on January 3, 2000, the Commonwealth's statement filed January 19, 2000, would be one day late, taking into account the Martin Luther King, Jr. holiday which fell on January 17, 2000. However, due to lack of recordation of the relevant information, we cannot with any certainty fix the date of entry of the order. Thus, there is no basis for us to properly conclude there existed a failure to comply with the order's directive to file a statement "within fourteen days" and we will proceed to our review of the Commonwealth's issues on appeal. *See generally Frazier v. City of Philadelphia*, 557 Pa. 618, 735 A.2d 113 (1999) (where docket did not reflect actual date of notice of entry of order appealed from, Commonwealth Court's quashal of appeal for untimeliness reversed and matter remanded for consideration of appeal on the merits).

¶ 5 On June 24, 1999, appellee, Delroy Phinn, was traveling west on Interstate 80 in Luzerne County as a passenger in a brown Honda Accord registered in his name and bearing Ohio license plates. Trooper Jeffrey A. Taylor of the Pennsylvania State Police observed appellee's vehicle following very closely behind a tractor-trailer. He testified, "This vehicle was – you wouldn't have been able to fit a motorcycle between them. He was right on his bumper." Trooper Taylor stopped the Accord for violating the following provision of the Vehicle Code:

**§ 3310. Following too closely**

**(a) General rule.**—The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway.

75 Pa.C.S.A. § 3310(a).

¶ 6 In a warrantless search conducted after the stop, fourteen pounds of marijuana were found inside a garment bag located in the trunk of the vehicle. At the suppression hearing, appellee argued, among other things, that the distance between the vehicles as observed by the officer, without more, did not set forth articu-

lable and reasonable grounds to suspect a violation of Section 3310. The court reluctantly suppressed the evidence pursuant to the rule of *stare decisis*, following as dispositive a published opinion of the Court of Common Pleas of Carbon County involving the same legal issue under strikingly similar factual circumstances which was affirmed by a memorandum decision of this court on the basis of the lower court's opinion.

¶ 7 In *Commonwealth v. Samuel*, 23 Pa. D & C 4th 29 (1995), the Carbon County court suppressed drugs and paraphernalia confiscated during a warrantless search by the Pennsylvania State Police of a blue Cadillac bearing North Carolina plates traveling west on Interstate 80 in which two of the three occupants were African-American, pursuant to a vehicle stop for a violation of Section 3310. In *Samuel*, the trooper testified that the Cadillac was "traveling less than one car length" behind a tractor-trailer. The defendants argued that the vehicle stop was pretextual and solely based on a "drug carrier's profile," i.e. "an expensive car carrying an out of state license with a black driver." *Id.* at 33. The Carbon County court agreed the stop was illegal, albeit for a different reason.

¶ 8 The Carbon County court determined that the purpose of Section 3310 "is to prevent accidents by requiring the driver to have his vehicle under such control that he or she can stop or maneuver safely if the vehicle in front stops or swerves unexpectedly." *Id.* The court found that the trooper's testimony regarding the distance between the vehicles was not, standing alone, sufficient to articulate "any lack of control by the driver of defendant's vehicle." *Id.* at 34. The court noted that the vehicle was not speeding and that there was no testimony by the trooper regarding "the traffic upon and the condition of the highway" set forth by the statute. The court concluded:

> [The trooper's] testimony related solely to the distance he observed between the

vehicles. We hold that a suspected violation of section 3310 of the Vehicle Code requires more articulation than just "traveling less than one car length" from another vehicle on the highway and a reasonable police officer would not have stopped defendants' vehicle on the facts observed and related to us by Trooper Miller. We find, therefore, that the police officers lacked reasonable suspicion to make a valid "traffic stop." *Id.* at 35.

¶ 9 The Commonwealth appealed from the *Samuel* decision and raised one issue: WHETHER THE STATE POLICE TROOPERS, BASED UPON THEIR OBSERVATION OF THE DEFENDANTS' VEHICLE TRAVELING LESS THAN ONE (1) CAR LENGTH BEHIND A TRACTOR-TRAILER WHILE THE TWO (2) VEHICLES WERE TRAVELING FIFTY-FIVE (55) MILES PER HOUR, HAD ARTICULABLE AND REASONABLE GROUNDS TO STOP THE DEFENDANTS' VEHICLE FOR A VIOLATION OF SECTION 3310 OF THE PENNSYLVANIA VEHICLE CODE[?]

■ ¶ 10 A panel of this court, in an unpublished memorandum, affirmed on the basis of the trial court opinion which we concluded "comprehensively discusses and properly disposes of the question presented." In the present matter, the Commonwealth argues that *Samuel* has no precedential value for similar cases involving similar issues and that the trial court erred in its conclusion that it was bound by the holding in *Samuel*. We agree that *Samuel*, a published decision of the Carbon County Court of Common Pleas, is not binding precedent. This court's affirmance of *Samuel* was reported by unpublished memorandum. *See* 448 Pa.Super. 656, 671 A.2d 772 (1995) (table). Unpublished memoranda of this court have no precedential value. *See Commonwealth v. Swinson*, 426 Pa.Super. 167, 626 A.2d 627, 629 n. 7 (1993) (unpublished memorandum

cannot be relied upon or cited for precedential value). *See also* Internal Operating Procedures of the Superior Court § 444.B. Thus, the Carbon County court's rationale for disposition of the issue in *Samuel* holds no precedential value beyond law of the case as to the parties directly involved.

■ ¶ 11 When we review the Commonwealth's appeal from a decision of the suppression court, "we consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in context of the entire record, remains uncontradicted." *Commonwealth v. Witherspoon*, 756 A.2d 677, 2000 PA Super 189, ¶ 2 (July 3, 2000) (quoting *Commonwealth v. Nester*, 551 Pa. 157, 709 A.2d 879, 880–81 (1998)). "When the evidence supports the suppression court's findings of fact . . ., this Court may reverse only when the legal conclusions drawn from those facts are erroneous." *Id.* (quoting *Commonwealth v. Valentin*, 748 A.2d 711, 713 (Pa.Super.2000)).

■ ¶ 12 After careful review of the record in the present case, we conclude the court's factual findings were supported by the evidence. It was established that appellee's vehicle was following the vehicle ahead of it in bumper to bumper fashion. We disagree however, with the court's legal conclusion that Trooper Taylor's observation thereof, standing alone, was insufficient to justify his stop of appellee's vehicle for a violation of Section 3310. We find that Trooper Taylor had reasonable suspicion to believe a violation of Section 3310 had occurred when he observed appellee's Accord traveling less than a motorcycle-length distance behind a tractor-trailer on Interstate 80 where the vehicles' respective rates of speed were at or near the speed limit for that highway. The evidence clearly bespeaks a hazard within the contemplation of Section 3310. Thus, we conclude that the *initial* stop of appellee's vehicle was lawful. Nonetheless, for the following reasons, we find the search of the contents of appellee's vehicle was ille-gal and conclude that suppression was the proper remedy. *See Commonwealth v. Garcia*, 746 A.2d 632, 638 (Pa.Super.2000) (this court may affirm the decision of the trial court if there is any basis on the record to support the trial court's action; this is so even if we rely on a different basis in our decision to affirm) (citing *Commonwealth v. Harper*, 416 Pa.Super. 608, 611 A.2d 1211, 1213 n. 1 (1992)).

■ ¶ 13 The sequence of events after Trooper Taylor legally stopped the vehicle follows. He approached the driver's side window and detected the odor of fabric softener, a product which he testified is sometimes used by drug transporters to mask the odor of marijuana. He also saw a round, plastic "air freshener" attached to the dashboard of the vehicle above the steering wheel. As the trooper approached, he saw the driver make a furtive movement with his hands below the seat. The trooper then "adamantly" directed the driver to "get [his] hands up" and ordered him out of the car. The driver complied. The trooper ordered him to the rear of the vehicle, where the driver produced a valid license and registration. The registration was in appellee-passenger's name. Appellee remained in the vehicle. The trooper made no records check on the license or the registration. The trooper gave the driver a written warning for following too closely and returned the documentation to him.

¶ 14 He told the driver he was "free to leave" and then immediately asked him whether he would agree to answer some questions. The driver agreed. The trooper asked him, "Where are you going; where are you coming from[?]" to which the driver replied "New Jersey to Ohio." The trooper then approached the passenger's door and had his first contact with appellee. He asked appellee the same questions he posed to the driver. Appellee answered that he had come from New York and was going to Ohio.

¶ 15 At that point, because of the "conflicting story," the aroma of fabric softener and the furtive hand movements of the driver, Trooper Taylor was "really curious as to what was underneath the front seat." He returned to the driver, who was still standing at the rear of the vehicle, and asked for consent to search the vehicle. There is no evidence that Trooper Taylor explained to the driver what objects he was looking for or that the driver could refuse to give consent. Despite the fact that Trooper Taylor knew that the vehicle was registered to appellee, appellee's consent to search was not specifically sought. The driver gave his consent and Trooper Taylor, after conducting a pat down search of the driver, opened the driver's side door and looked under the front seat of the vehicle, finding nothing.

¶ 16 The trooper continued to search the interior of the vehicle. On the front seat, he found a very small quantity of a green substance which might have been marijuana. Trooper Taylor then asked appellee whether there was marijuana in the vehicle. Appellee answered, "No. Go ahead and look." At that point, it appears that appellee was removed from the vehicle and patted down. The remainder of the interior of the vehicle was searched and no contraband was found. The green substance recovered from the front seat was not tested.

¶ 17 Trooper Taylor next opened the locked trunk of the vehicle. He saw no contraband. In the trunk were various items of luggage including a black garment bag which was zipped shut. Trooper Taylor unzipped the bag and saw it contained fabric softener sheets. He reached inside the bag, underneath the sheets, and found a package of what was later determined to be fourteen pounds of marijuana. Appellee and the driver were arrested and gave statements. Appellee told police that the marijuana was his and that the driver was unaware of its existence. The driver was released and appellee was charged with possession with intent to deliver a controlled substance.

¶ 18 The Commonwealth, on appeal, argues that the evidence was seized pursuant to voluntary and valid consent to search which was given by the driver and appellee. Thus, the Commonwealth contends that the order of suppression was error. We affirm the order of suppression after careful review and in light of two recent decisions of our supreme court which guide our disposition of the issue raised and which we conclude are controlling. *Commonwealth v. Freeman*, —— Pa. ——, 757 A.2d 903 (2000); *Commonwealth v. Strickler*, —— Pa. ——, 757 A.2d 884 (2000).

¶ 19 There exist three levels of interactions between citizens and police officers under our Fourth Amendment jurisprudence:

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Ellis*, 541 Pa. 285, 662 A.2d 1043, 1047 (1995) (citations and footnotes omitted). An investigative detention constitutes a seizure of the person and must be supported by reasonable suspicion that those detained are engaged in criminal activity. *Commonwealth v. McClease*, 750 A.2d 320, 325 (Pa.Super.2000) (citing *Commonwealth v. Hall*, 558 Pa. 16, 735 A.2d 654, 659 (1999)).

¶ 20 In *Commonwealth v. Hoak*, 700 A.2d 1263 (Pa.Super.1997) (*en banc*), *aff'd by an equally divided court*, 557 Pa. 496, 734 A.2d 1275 (1999), this court held that valid consent to search a vehicle arises

which is voluntary and not the result of an investigative detention requiring reasonable suspicion of criminal activity, where an officer, after a vehicle stop, returns the driver's documents and informs him that he is "free to go" before seeking consent to search. Our rationale was that after a motorist has been informed the detention has ended, further interaction between the officer and the motorist can no longer be properly seen as resulting from a "seizure" or investigative detention of the motorist. *Id.* at 1268. Thus, no level of suspicion is required for continued questioning because the interaction has been transformed from an investigative detention into a mere encounter. *See generally Id.* at 1268–72. *See also Commonwealth v. Witherspoon, supra,* ¶ 10 (when the surrounding circumstances show that police conduct would have communicated to a reasonable person that he was at liberty to ignore the police presence and go about his business, "the investigative detention converts into a mere encounter") (citing *Hoak, supra* ).

¶ 21 Here, Trooper Taylor stated that his search of the vehicle was premised on the "guidelines" set forth in *Hoak.* He testified that in his opinion, the circumstances surrounding the stop of appellee's vehicle did not provide enough probable cause "to get a search warrant. So I was going by the *Hoak* case." "I explained the reason for the stop. I wrote the driver a warning for the violation. I returned his information. Told him he's free to leave. Asked for consent to search."

¶ 22 Our supreme court has recently held that subsequent interactions between a motorist and a police officer after the motorist has been told he is free to go and in which the officer requests consent to search the vehicle, may under certain circumstances, constitute a "second" or "subsequent" seizure of the motorist in the nature of an investigative detention requiring reasonable suspicion of criminal activi-

ty. *Commonwealth v. Freeman, supra; Commonwealth v. Strickler, supra.*

¶ 23 In *Freeman,* a State Police trooper stopped Freeman's vehicle on Interstate 80 in Monroe County after noticing that it was traveling "fairly close together" with another vehicle, switching lanes and "jockeying" for position. *Id.,* at 904. Another trooper stopped the other vehicle. Freeman denied she was traveling with the other vehicle. She produced her license and registration which were checked via radio and found to be valid. The trooper who stopped Freeman learned that the occupants of the other vehicle, contrary to Freeman's assertion, stated that the two vehicles were traveling together. The trooper gave Freeman a written warning for improper lane changes and windshield obstructions, returned her documentation and informed her she was free to leave. Freeman did not leave however, and the trooper asked her again whether she was traveling with the second car. When she replied she was not, the trooper confronted her with the conflicting story given by the occupants of the other car. He removed her from the vehicle and asked for consent to search. Freeman gave consent and five packages of marijuana were found.

¶ 24 Freeman was charged with possession with intent to deliver a controlled substance. Her suppression motion was denied and she was convicted following a non-jury trial. In Freeman's appeal from the judgment of sentence [2], she alleged she was entitled to suppression because, among other things, her consent to search was invalid and tainted by an illegal detention. This court, relying on *Hoak, supra,* affirmed. Our supreme court granted allowance of appeal limited to the suppression issue.

¶ 25 Freeman did not challenge the legitimacy of the initial stop for improper lane changes.

2.  Freeman was sentenced to a term of from 3 to 23 months imprisonment. The Commonwealth appealed, challenging the trial court's

failure to impose the mandatory minimum sentence. Freeman's appeal from the judgment of sentence was filed as a cross-appeal.

She contend[ed], rather, that the initial stop was followed by a further detention that was unsupported by any reasonable suspicion of criminal activity, and was therefore illegal. Although Freeman consented to the search of her vehicle, she maintain[ed] that her consent was ineffective because it was tainted by the illegality of her detention, and the results of the search must therefore be suppressed.

*Id.*, at 906.

¶ 26 The supreme court reversed this court's order of affirmance. It held that the interaction between Freeman and the police consisted of two separate encounters, each of which constituted an investigative detention. The first encounter was a lawful investigative detention of Freeman based on a reasonable and articulable suspicion that she violated the motor vehicle code. That encounter had a "clear endpoint" which was signaled by the trooper "advising Freeman that she was free to depart after returning her driver's documentation and issuing an appropriate traffic warning." *Id.*, at 907.

■■■ ¶ 27 The court held that the second encounter was also a seizure of the person and occurred when the trooper subsequently resumed questioning Freeman, ordered her out of the vehicle and asked for consent to search.[3] *Id.* The court concluded that the transition into and character of the subsequent interaction supported the conclusion that Freeman was subject to a second seizure of her person as follows:

[T]he trooper's subsequent actions were inconsistent with his statement to Freeman that she was free to leave, as he: returned to Freeman's vehicle; questioned her about the second vehicle; pointed out the inconsistent statements

from the vehicle's occupants when she denied traveling with that vehicle; and, ultimately and most significantly, asked her to step out of the vehicle prior to the request for consent. Such directive constituted a greater show of authority than had previously been made (other than the physical stop of Freeman's vehicle itself). *See Strickler*, — Pa. —, 757 A.2d at 896 (citing *Ferris v. State*, 355 Md. 356, 735 A.2d 491, 505 (1999) (stating that "a request that an individual move in some manner has been consistently regarded by this Court as persuasive evidence that a fourth amendment seizure has occurred" (citation omitted))). Moreover, given everything that had come before, although these events occurred after express conferral of advice that Freeman was free to depart, they would have suggested to a reasonable person that such advice was no longer operative.

*Id.*, at 907.

¶ 28 The court concluded that the trooper had no reasonable and articulable suspicion of criminal activity on Freeman's part to warrant the second investigative detention and thus, it concluded that the second detention was illegal. *Id.*, at 908. Ultimately, the court found that Freeman's consent to search was invalid because it was the product of an illegal detention:

...Freeman's consent, even if voluntarily given, will not justify the otherwise illegal search unless the Commonwealth can demonstrate that Freeman's consent was an "independent act of free will" and "not the product of the illegal detention." *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983). *See generally Strickler*, — Pa. at — n. 4, 757 A.2d at 889 n. 4. In this regard, we deem the three factors articulated in *Brown v. Illinois*, 422 U.S. 590,

---

**3.** The test in making a determination of whether a seizure of the person has occurred is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he or she was free to ignore the police questioning or otherwise end the encounter. *Id.*, at 888 (citing *Commonwealth v. Strickler, supra* ). Moreover, the existence of a prior, lawful detention is a factor "engrafting a degree of coercion upon" the subsequent encounter. *Strickler*, at 900.

95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), relevant to this inquiry: the temporal proximity of the detention and the consent, any intervening circumstances, and particularly, the purpose and flagrancy of the officer's unlawful conduct. *See id.* at 603–04, 95 S.Ct. at 2261–62. Here, although we do not view the trooper's actions as flagrant, the record does not establish the necessary break in the sequence of events that would isolate Freeman's consent from the prior coercive interaction. To the contrary, the evidence supports the conclusion that the trooper's initiation of a second seizure and receipt of Freeman's consent were integrally connected. As Freeman's consent was invalid, the fruits of its conferral must be suppressed.

*Id.*, at 909.

¶ 29 In the instant matter, the record is clear that Trooper Taylor never told appellee that he was "free to go" despite knowing the vehicle was registered to him. Trooper Taylor only communicated that information to the driver and we cannot simply impute that advice to appellee where it was not given to him. Moreover, appellee's registration for the vehicle, which was produced upon demand, was returned to the driver, not to appellee, and there is no evidence that appellee was aware the registration had been returned.

■ ¶ 30 Appellee's first contact with the trooper occurred while he was sitting in the passenger seat of the stopped car when the trooper questioned him regarding his travel itinerary. The driver, who had been previously ordered in an "adamant" tone of voice to raise his hands and get out of the car, had not returned, but was standing at the rear of the car. A seizure of the person may be indicated,

*inter alia,* when the officer's use of language or tone of voice indicates that compliance with the officer's request might be compelled. *Hoak,* 700 A.2d at 1268 (citing *United States v. Mendenhall,* 446 U.S. 544, 553–54, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)).

¶ 31 After appellee answered the trooper's questions, the trooper went back to the driver and obtained the driver's consent to search the vehicle. There is no evidence that appellee was aware the driver had been asked for consent to search. The trooper then patted the driver down. The trooper returned to the front of the car alone. He began searching the car with appellee still sitting in it.

■ ¶ 32 Based on this record, we cannot conclude that either the driver or appellee felt free to end the encounter at any time. We find the officer's continued questioning of appellee after the officer concluded the stop by returning the documentation and informing the driver he was free to go did not convert the interaction into a mere encounter requiring no level of suspicion, but constituted a second or subsequent investigative detention.[4]

■ ¶ 33 We must now determine whether the detention of appellee was lawful by an examination of whether Trooper Taylor had reasonable and articulable suspicion of criminal activity to warrant the detention. In *Commonwealth v. Pless,* 451 Pa.Super. 209, 679 A.2d 232 (1996), two State Police troopers stopped appellee for vehicle code violations while she was traveling on Interstate 80 in Mercer County. Her license and registration were requested. She held her hands in a peculiar manner and took longer than would normally be required to retrieve her docu-

---

4. We do not read *Hoak* so expansively as to require a finding that every instance of continued police questioning of a motorist after his documents have been returned and he has been told he may leave constitutes a "mere encounter." Rather, the totality of the circumstances approach set forth in *Freeman* and *Strickler* (accord *Commonwealth v. Wil-*

*mington,* 729 A.2d 1160, 1172 (Pa.Super.1999) (*en banc*)), requires us to examine the entire course of interaction between the officer and motorist and not merely whether the motorist was advised he was free to go. In any event, the instant record is clear that appellee was *never* so advised.

ments from her purse, but eventually did so. While filling out a written warning for the traffic violations, one of the troopers noticed appellee squirming in her seat and moving her head from side to side. She was removed from the driver's seat to the back of the vehicle, where the warning was administered, her license and registration were returned and she was told "she was free to leave." *Id.* at 233. The troopers then asked for consent to search the vehicle, which appellee granted. The search uncovered cocaine. After a hearing, the cocaine was suppressed. The Commonwealth appealed and claimed the suppression court erred because appellee gave valid consent to search the vehicle. We affirmed the grant of suppression and reasoned as follows:

A state trooper may stop a motor vehicle if the trooper reasonably believes that a provision of the Motor Vehicle Code is being violated. [*Commonwealth v.*] *DeWitt*, 530 Pa. [299] at 304, 608 A.2d [1030] at 1032 [ (1992) ]. Incident to this stop, the trooper may check the vehicle's registration and the driver's license and issue a citation. *Commonwealth v. Talley*, 430 Pa.Super. 351, 356, 634 A.2d 640, 643 (1993). After producing a valid driver's license and vehicle registration, the driver must be allowed to proceed without further delay by the police, unless the police have "reasonable grounds to suspect an illegal transaction in drugs or other serious crime." *Commonwealth v. Lopez*, 415 Pa.Super. 252, 262, 609 A.2d 177, 182 (1992), *allocatur denied*, 533 Pa. 598, 617 A.2d 1273 (1992).

In the instant case, Trooper Houk acted lawfully in stopping appellee for speeding and for driving with a burned out tail lamp. However, as appellee was properly issued a warning for the motor vehicle code violations, and as her driver's license and registration passed a record check, Trooper Houk was required to have reasonable grounds to suspect an illegal transaction in drugs or other serious crime in order to further detain appellee. *Lopez, supra.* The

mere fact that Trooper Houk thought that appellee was hiding something when she retrieved her license from her purse, and the fact he thought appellee's side to side movements were "furtive" while she sat waiting for him to complete the warning card, was not enough for reasonable grounds to suspect a crime. *See Commonwealth v. Parker*, 422 Pa.Super. 393, 400, 619 A.2d 735, 738 (1993) (police officer's knowledge that defendant had been previously arrested for a drug violation, without articulable grounds to suspect the presence of drugs, was insufficient to detain defendant); *Lopez, supra* (police officer's intuition does not constitute a reasonable ground to suspect criminal activity is afoot)[.]

*Id.* at 233–34.

¶ 34 In *Commonwealth v. Rogers*, 741 A.2d 813 (Pa.Super.1999), *appeal granted*, —— Pa. ——, 759 A.2d 922, No. 851 W.D.Alloc.Dkt.1999 (July 31, 2000), the issue raised by the Commonwealth on appeal from an order of suppression was whether the trial court correctly concluded that a Pennsylvania State Trooper lacked reasonable suspicion of criminal activity to warrant conducting an investigative detention. The facts showed that appellee's vehicle bearing an expired temporary Tennessee license plate was stopped for speeding. When the trooper approached the vehicle, he saw an open box of laundry detergent, fabric softener sheets and scotch tape lying in the back seat. The trooper knew from prior experience in narcotics arrests that laundry supplies are sometimes used to mask the odor of marijuana. The appellee driver was in an extreme state of nervousness. When asked where he was coming from, the appellee averred he had been visiting a friend but could not remember the friend's address. He averred he had just bought the car. The paperwork for the vehicle was incomplete. The name on the title form did not match the name on appellee's Texas driver's license. Appellee acknowledged that

one of the addresses listed in the vehicle's documents was fictitious. Appellee refused consent to search the vehicle. A criminal history check showed appellee had prior drug convictions. A canine drug detection unit arrived and a trained police dog immediately alerted on the driver's side door. A search warrant was issued and fifty-two pounds of marijuana were seized. On these facts, this court found the trooper had reasonable suspicion that appellee was engaging in criminal activity and thus, we reversed the suppression order. *Id.*

¶ 35 Here, at the time Trooper Taylor concluded the traffic stop, there was an odor of fabric softener in a car that contained a plastic air freshener and a furtive hand movement by the driver. The occupants of the vehicle did not appear nervous. The paperwork for the driver and the vehicle were in order. Although, perhaps, a close case, we conclude these facts did not support a reasonable suspicion of criminal activity.[5] We find the facts of this case more analogous to *Pless* than to *Rogers.* Thus, the questioning of appellee, which we find was an investigative detention and seizure of his person, was not supported by the necessary reasonable suspicion of criminal activity. We conclude the detention was constitutionally infirm.

■ ¶ 36 The Commonwealth nonetheless argues that appellee's consent to search cured any illegality. On the basis of the elements for determining voluntariness of consent to search during an illegal detention as set forth in *Strickler* and *Freeman,* we disagree. There was no attenuation between the illegal detention and the consent of either the driver or appellee. The driver had been adamantly told to get his hands up and was removed to the back of the vehicle where he remained separated from appellee at the time the driver gave his consent to search. At the time appellee gave consent to search, he was sitting in the vehicle. He had not been told he was free to go and his vehicle registration had not been returned to him. We see no intervening factors which would have diminished the coercive atmosphere of the detention and would have justified the search as having been conducted pursuant to a valid and voluntary consent to search. *Strickler, supra; Freeman, supra. See also Commonwealth v. Helm,* 456 Pa.Super. 370, 690 A.2d 739 (1997) (because consent to search was obtained during illegal detention, evidence found during search of trunk must be suppressed); *Pless, supra* (because the detention was illegal, consent to search vehicle was invalid and evidence must be suppressed); *Lopez,* 415 Pa.Super. 252, 609 A.2d 177 (consent to search vehicle was tainted where it was obtained during an illegal detention).

¶ 37 In applying the law which has now reached Byzantine proportion in its complexity, we find that Trooper Taylor conducted a proper traffic stop for a violation of the vehicle code. Appellee was not told he was "free to leave" at any time nor would a reasonable person have concluded he was free to terminate the encounter under a totality of the circumstances. Thus, we find that the questioning of appellee occurred during an investigative detention. Because we find that reasonable suspicion of criminal activity was lacking to support an investigative detention, and because there was no attenuation between the illegal detention and the consent, we conclude that the consent to search the vehicle was invalid. Accordingly, we affirm the order which suppressed the marijuana found in a garment bag located in the trunk of appellee's vehicle. Moreover, appellee's subsequent statements to police are suppressible as "fruit of the poisonous tree." *Wong Sun v. United States,* 371

---

5. The small quantity of green substance in the front seat was found after the trooper began questioning appellee and thus cannot be considered in determining whether a reasonable suspicion of criminal activity existed sufficient to warrant the detention. Similarly, the "conflicting story" regarding itinerary was obtained during the detention.

U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

¶ 38 The order of suppression is affirmed.