COMMONWEALTH of Pennsylvania, Appellee

v.

**Joseph H. METTS, Appellant.**

Superior Court of Pennsylvania.

Submitted April 16, 2001.

Filed Nov. 19, 2001.

___

Jack W. Connor, Uniontown, for appellant.

Nancy A. Duffield, Assistant District Attorney, Uniontown, for Com., appellee.

Before: McEWEN, President Judge Emeritus, CERCONE, President Judge Emeritus and OLSZEWSKI, J.

CERCONE, President Judge Emeritus.

¶ 1 Appellant Joseph Metts appeals from the judgment of sentence imposed on May 4, 2000. We affirm.

¶ 2 In May of 1993, Appellant was convicted of first degree murder, robbery and related theft offenses stemming from the murder of Fayette County Prison corrections officer Piper Newland. *Commonwealth v. Metts*, 558 Pa. 191, 736 A.2d 552 (1999). Our Court affirmed the judgment of sentence and the Pennsylvania Supreme Court subsequently granted allocatur. The Supreme Court ultimately reversed the judgment of sentence holding that, pursuant to *Commonwealth v. Brion*, 539 Pa. 256, 652 A.2d 287 (1994), the Trial Court should have suppressed two of Appellant's conversations which were intercepted and tape recorded via electronic surveillance at the home of Appellant's sister, Wendy Kulenovic. *Metts, supra.*

¶ 3 Following the reversal of the judgment of sentence, Appellant filed a motion to suppress the tape recordings of the electronic surveillance and

all fruits of the illegal electronic surveillance and/or wiretapping that occurred on January 27, 1992 and/or February 6, 1992, specifically including, but not limited [sic], the firearm held in evidence in the instant case as well as any and all testing and tests [sic] results conducted upon said gun, any and all evidence relating to how the subject firearm came to be where it was located and/or the identification of where the same was located, the testimony of Wendy Kulenovic, Dwayne Kulenovic, Judith A. Sparks, Earl G. Mayfield, Vanessa Coons, any and all other witnesses who were identified as a result of the tape recordings and/or communications obtained and derivative from the illegal interception on the above specified dates, and any and all statements, to the extent there are any, of petitioner which were obtained subsequent to February 6, 1992.

Motion to Suppress, 2/17/00, at 2. The Trial Court granted Appellant's motion to suppress the tape recordings of the electronic surveillance, but denied the request for a hearing on the remaining issues. The Trial Court explained that it would entertain timely objections to specific evidence at trial. Trial Court Order, filed 2/22/00. Upon receipt of this order, Appellant moved for a hearing on the remaining items of evidence included in the motion to suppress, averring that he would be preju-

diced by not knowing what evidence was to be introduced at trial. A hearing was held on March 2, 2000, following which the Trial Court affirmed its order of February 22, 2000, and denied Appellant's motion to suppress the firearm. Trial Court Order, filed 3/2/00.

¶ 4 On April 25, 2000, Appellant filed a motion to dismiss, averring that his retrial should be barred on double jeopardy grounds due to alleged prosecutorial misconduct which denied him a fair trial. A hearing was held on this motion and the motion was dismissed by order dated May 1, 2000. An opinion in support of this order was filed on May 3, 2000. Appellant's second trial by jury was conducted May 1–4, 2000. The evidence presented at trial revealed the following:

¶ 5 Appellant's sister, Wendy Kulenovic, testified that Appellant and Wendy's husband, Dwayne Kulenovic, left the Kulenovic residence between 6:00 and 8:00 p.m. on January 4, 1992.[1] N.T. Trial, 5/1/00 at 127. They returned home at 1:50 a.m., but left again, purportedly to purchase beer at a local bar. *Id.* At 2:00 a.m., two upstairs neighbors of the victim, Piper Newland, testified that they heard two noises that sounded like a car backfiring. *Id.* at 28, 35. Upon looking out their third story window, they saw the victim lying on the sidewalk. *Id.* at 29, 36. They called 911, and police and an ambulance responded. *Id.* at 39. The victim was pronounced dead at 2:43 a.m. as a result of a gunshot wound to the face.

¶ 6 At 2:15 a.m. Appellant entered his sister Wendy Kulenovic's bedroom and awakened her. He was crying and confessed to her that he had shot the victim in the head. *Id.* at 128, 137. He said Dwayne was not home; he had run. *Id.* at 128. She indicated that Appellant was drunk at this time. *Id.* at 153. He offered his sister the victim's cosmetic bag, which she refused. *Id.* at 128. She testified that she then went to the kitchen where she observed Appellant take fifty dollars from a wallet and state that he had shot her for a lousy fifty dollars. *Id.* at 129. Wendy Kulenovic also observed Appellant go through a black purse that was on the kitchen table. *Id.* The purse contained papers with the victim's name on them, a lighter, and keys. *Id.* She also saw, on the table, a gun which she recognized as belonging to an acquaintance, Paul Kuba. She had fired the gun on occasion at Paul Kuba's residence, and testified that the gun had recently been kept in the fuse box of her residence. *Id.* at 130–131. Dwayne Kulenovic returned home approximately one hour later. *Id.* at 133. He unloaded the gun which contained four live rounds and two empty shells. *Id.* at 134. Wendy Kulenovic was told to "cooperate and stick to the story that they got home at 10 till 2" and that they did not leave the house again. *Id.* at 137. The two men then left the residence.

¶ 7 At approximately 3:00 a.m. they arrived at the residence of Earl Mayfield and Judith Sparks. Id. at 93. Earl Mayfield testified that Appellant was carrying a pistol in the belt of his pants.[2] *Id.* at 94. He took the pistol from Appellant and unloaded it.[3] *Id.* After drinking a few beers with

---

1. Appellant was staying with the Kulenovics at this time. *See* N.T., *infra,* at 125; N.T. Trial, 5/2/00, at 43.

2. Earl Mayfield was deceased at the time of the second trial. His prior testimony was read into the record. N.T. Trial, 5/1/00, at 91.

3. We note that this testimony possibly conflicts with the testimony given by Wendy Ku-

lenovic that she saw her husband, Dwayne Kulenovic, unload the gun in the kitchen of their home. A review of the notes of testimony does not reveal whether the gun was reloaded before Dwayne Kulenovic left his house to go to Earl Mayfield's house or whether the testimony does in fact conflict. Which testimony to believe is a question for the finder of fact, in this case the jury. In his

Earl Mayfield, the two men went to sleep on the living room floor. *Id.* at 95. Later that morning, Earl Mayfield gave the pistol to Dwayne Kulenovic who then walked across the street to his grandmother's house. *Id.*

¶ 8 Vanessa Kuhns Wilson, Dwayne Kulenovic's sister, who lived at the grandmother's house, testified that Dwayne Kulenovic came into her bedroom in the early morning hours of January 5, 1992 and awakened her. *Id.* at 103–104. He told her that Appellant had shot the victim. N.T. Trial, 5/2/00 at 8. He handed her a gun and stated "Here's the gun. Hide it for me." *Id.* Later that day, she took the gun and threw it into Coolspring Reservior. *Id.;* N.T. Trial, 5/1/00, at 106. After leaving his grandmother's house, Dwayne Kulenovic returned to Earl Mayfield's residence and witness Judith Sparks drove Dwayne Kulenovic and Appellant back to the Kulenovic residence. N.T. Trial, 5/1/00, at 88, 95.

¶ 9 On January 9, 1992, two days after being released from jail, Paul Kuba, the owner of the gun, contacted Dwayne Kulenovic regarding some personal property that Dwayne Kulenovic was keeping for him while he was incarcerated. *Id.* at 187. Dwayne Kulenovic explained that his home had been robbed and Paul Kuba's belongings stolen. *Id.* at 188. They subsequently met at the Oasis Bar in Uniontown, and spoke. *Id.* at 189. As a result of their conversation, Paul Kuba contacted Trooper Brownfield of the Pennsylvania State Police, and Trooper Brownfield directed him to Officers Sneddon, Machesky and Kara of the Uniontown Police Department. *Id.* at 191. On two occasions in late January and early February 1992 [4], at the request of the police, Paul Kuba entered the Kulenovic residence and engaged in conversation with Appellant and Dwayne and Wendy Kulenovic. *Id.* at 191–192. The police remained outside the home. Paul Kuba testified that during the visit in February, Appellant admitted to him that he had killed the victim and got fifty dollars as a result. *Id.* at 192, 194. In response to Paul Kuba's questioning, he denied using drugs. *Id.* at 194. After leaving the Kulenovic residence, Paul Kuba spoke to Officer Machesky and Trooper Brownfield, telling them that Appellant had admitted to killing the victim for fifty dollars. *Id.* at 195. He also repeated to them what the Kulenovics told him. *Id.* He admitted to getting drunk during the visit, but after Appellant had already confessed. *Id.* at 197. He also admitted that he hated Appellant for what he did and wanted to help police "nail him." *Id.* at 201. He knew the victim from his prior incarceration and thought she was a "nice lady." *Id.* at 205. Also, Appellant was suspected of stealing Paul Kuba's belongings. *Id.* at 201.

¶ 10 Officer Machesky testified that the information given to him by Paul Kuba after Kuba left the Kulenovic residence was sufficient to give him probable cause to arrest Appellant and Dwayne and Wendy Kulenovic. *Id.* at 163. On March 4, 1992, Wendy Kulenovic was arrested and charged with hindering apprehension and conspiracy to commit homicide. *Id.* at 137, 163. After her arrest, she gave a statement to Trooper Brownfield and a recorded statement to the District Attorney. *Id.* at 138, 141. She was offered immunity by the Commonwealth for her truthful testimony. *Id.* at 138. She denied that she was testifying against her brother to pro-

---

Opinion, the Trial Judge cites only to Wendy Kulenovic's testimony. Trial Court Opinion, filed 11/28/00, at 5. As it is not material to our disposition, we need not resolve this discrepancy.

4. Presumably the dates of the illegal electronic surveillance.

tect her husband. *Id.* at 139. Since the date of the murder, she and Dwayne Kulenovic had divorced.

¶ 11 A couple of months after the murder, the police contacted Vanessa Kuhns Wilson regarding the gun used in the murder. *Id.* at 107. She showed them the place where she threw the gun into the reservoir, and the gun was subsequently recovered by divers and identified as the murder weapon. *Id.* at 107, 120.

¶ 12 On May 4, 2000, Appellant was convicted of second degree murder, robbery, theft by unlawful taking, and theft by receiving stolen property.[5] He was sentenced that same day to life imprisonment on the murder charge and a consecutive 10–20 year term of imprisonment on the robbery charge. Post sentence motions were filed on May 10, 2000 and were granted in part with the Trial Court amending Appellant's sentence to omit the 10–20 year term for robbery, as robbery is a lesser included offense of second degree murder. The remaining post sentence motions were not ruled upon by the Trial Court, therefore they were deemed denied by operation of law on September 7, 2000.[6] *See* Pa.R.Crim.P. 1410 [7] ("If the judge fails to decide the motion within 120 days, or to grant an extension ... the motion shall be deemed denied by operation of law.").[8] Appellant's notice of appeal to this Court was filed on October 4, 2000. An amended notice of appeal was filed on October 6, 2000.

¶ 13 Appellant presents two issues for our review:

1. WHETHER THE LOWER COURT ERRED IN REFUSING THE [SIC] GRANT APPELLANT'S MOTION TO SUPPRESS THE FRUITS OF THE ILLEGAL ELECTRONIC SURVEILLANCE, AS SO DECREED BY THE SUPREME COURT OF PENNSYLVANIA, CONDUCTED IN THE INSTANT CASE?

2. WHETHER THE LOWER COURT ERRED IN FAILING TO GRANT APPELLANT'S MOTION TO DISMISS PRUSUANT [SIC] TO *COMMONWEALTH V. SMITH* AND THE DOUBLE JEOPARDY CLAUSE OF THE PENNSYLVANIA CONSTITUTION AS THE EVIDENCE OF RECORD ESTABLISHED THAT THE TAPE RECORDING PLAYED BY THE COMMONWEALTH AT APPELLANT'S FIRST TRIAL RELATED APPELLANT AS STATING "I SHOT HER FOR THE CASH, MAN" WHEN THE TAPES, SEALED IN EVIDENCE, INDICATE THE SAME LINE AS STATING "HE SHOT HER FOR THE CASH, MAN" IN A VOICE OTHER THAN APPELLANT'S THEREUPON ESTABLISHING THAT THE COMMONWEALTH ENGAGED IN PROSECUTORIAL MISCONDUCT AND ACCORDINGLY INTENTIONALLY FABRICATED THE SUBJECT EVIDENCE AND/OR IN-

---

**5.** 18 Pa.C.S.A. §§ 2502, 3701, 3921, and 3925, respectively.

**6.** A Trial Court order purporting to deny Appellant's post sentence motions was entered on November 28, 2000, however, this order is a nullity, because, as explained above, the post sentence motions were deemed denied by operation of law on September 7, 2000.

**7.** As of April 1, 2001, Pa.R.Crim.P. 1410 has been renumbered as Pa.R.Crim.P. 720.

**8.** The clerk of courts has failed to enter an order as required by Pa.R.Crim.P. 1410(B)(3)(c) informing the parties that the post sentence motions are deemed denied by operation of law. This rule is important in that it triggers the 30 day appeal period provided for in Rule 1410(A)(2)(b). Because Appellant has filed a timely notice of appeal we find the clerk of courts' failure to follow proper procedure harmless in this instance.

TENTIONALLY MISREPRESENTED WHAT APPEARED ON THE ACTUAL TAPE RECORDING TO THE EMPANELED JURY CONVEYING THAT APPELLANT HAD CONFESSED TO THE SUBJECT CRIME?

Appellant's Brief at 5.

■ ¶ 14 In an appeal from the denial of a motion to suppress, the role of the Superior Court is to determine whether the certified record supports the suppression court's factual findings and the legitimacy of the inferences and legal conclusions drawn from those findings. *Commonwealth v. Laney*, 729 A.2d 598, 601 (Pa.Super.1999).

> In making this determination, we may consider only the evidence of the prosecution's witnesses and so much of the defense as, fairly read in the context of the record as a whole, remains uncontradicted. When the factual findings of the suppression court are supported by the evidence, we may reverse only if there is an error in the legal conclusions drawn from those factual findings.

*Id.*, quoting *Commonwealth v. Carlson*, 705 A.2d 468, 469 (Pa.Super.1998).

¶ 15 Appellant's first issue involves the denial of his motion to suppress the alleged fruits of the electronic surveillance illegally conducted [9] on January 27, 1992 and February 6, 1992. Appellant contends that all evidence obtained as a result of Wendy Kulenovic's statement to the police should be suppressed. This evidence includes statements by witnesses Earl Mayfield, Judith Sparks and Vanessa Kuhns Wilson, and the weapon which was discovered through information obtained from Vanessa Kuhns Wilson. Appellant reasons that Wendy Kulenovic's statement was given after her arrest and that her arrest was based on information acquired from the tape recordings of the illegal electronic surveillance, thus the information in her statement was derived from the illegal electronic surveillance and should be suppressed.

■ ¶ 16 In addressing Appellant's post sentence motion dealing with the suppression of Wendy Kulenovic's statement, the Trial Court found that the information given to the police by Paul Kuba following his conversation with Dwayne Kulenovic in the Oasis Bar was known prior to and independent of the electronic surveillance and independent of police involvement, and was the initial link in the chain leading to Wendy Kulenovic. Trial Court Opinion, 11/28/00, at 7–8. The Trial Court found that little new information was garnered by Kuba in the Kulenovic residence, thus the discovery of witness Wendy Kulenovic was not solely the result of illegally obtained evidence. We agree with the Trial Court's assessment that the information obtained through the Oasis Bar conversation did not result from illegal police activity, however this information did not form the basis for Wendy Kulenovic's arrest.[10] Officer Machesky testified at trial that he interviewed Paul Kuba immediately upon Kuba exiting the Kulenovic residence following the tape recorded conversations. N.T. Trial, 5/1/00, at 163; *See also* N.T. Omnibus Pre Trial Hearing, 3/2/00, at 38. The information related orally by Paul Kuba concerned the conversation that had just occurred within the Kulenovic resi-

---

9. *See Metts, supra.*

10. According to the Officer's Memorandum filed by Officer Machesky requesting approval for electronic surveillance, Paul Kuba orally informed Officer Machesky on January 27, 1992 that while at the Oasis Bar, Dwayne Kulenovic told him that Appellant shot the victim, that he, Dwayne Kulenovic, had run, and that his wife, Wendy Kulenovic, knew about the incident. *See* Commonwealth's Exhibit 1 to Omnibus Pre Trial Proceedings, 10/16/92.

dence with Appellant and the Kulenovics. Officer Machesky testified that this information, not the information from the Oasis Bar conversation or the tape recorded information, formed the basis for the affidavit of probable cause to arrest Wendy Kulenovic. *Id.*

¶ 17 Contrary to Officer Machesky's testimony, Appellant argues that the affidavit in support of the Wendy Kulenovic's arrest warrant was based solely upon the information obtained through the tape recorded conversations, however Appellant has failed to support his argument by making this affidavit available for our review.[11] It is Appellant's duty to provide a complete record to facilitate meaningful appellate review. *Commonwealth v. Chopak,* 532 Pa. 227, 615 A.2d 696 (1992). Without evidence to contradict Officer Machesky's statement that he based Wendy Kulenovic's arrest on the oral information supplied by Paul Kuba, we must find that the evidence supports the Trial Court's denial of Appellant's motion to suppress Wendy Kulenovic's statement and the evidence derived therefrom.[12]

¶ 18 We note that Appellant vigorously argues that this Court as well as our Supreme Court have "directed that the fruits of any illegal electronic surveillance or wiretap must be suppressed along with the contents of the illegal communication." Appellant's Brief at 13. Appellant cites *Commonwealth v. Brachbill,* 520 Pa. 533, 555 A.2d 82 (1989), *Commonwealth v. Darush,* 740 A.2d 722 (Pa.Super.1999), *Commonwealth v. Bannister,* 440 Pa.Super. 476, 656 A.2d 129 (1995), and *Common-*

*wealth v. Schaeffer,* 370 Pa.Super. 179, 536 A.2d 354 (1987), *affirmed* 539 Pa. 272, 652 A.2d 294 (1994) in support. A review of these cases reveals that they do not support Appellant's position.

¶ 19 In *Schaeffer, supra,* a police informant consented to wear a wire while speaking to the defendant. Based upon the information obtained from the wire, the police obtained a search warrant for the defendant's house which led to the seizure of the illegal drugs that formed the basis for the defendant's conviction for various drug offenses. On appeal, we held that the Pennsylvania Constitution requires a warrant based upon probable cause for the electronic seizure of communications between an informant and a defendant in defendant's home. We ruled that the drugs seized as a result of the search warrant should have been suppressed and we remanded for a new trial. The *Schaeffer* holding is reiterated in *Commonwealth v. Brion,* 539 Pa. 256, 261, 652 A.2d 287, 289 (1994) wherein our Supreme Court held that "an individual can reasonably expect that his right to privacy will not be violated in his home through the use of any electronic surveillance ... With respect to oral communications occurring within one's home, interception [when one party has consented] can only be deemed constitutional under [the Pennsylvania Constitution] if there has been a prior determination of probable cause by a neutral, judicial authority." *Brion, supra,* at 261, 652 A.2d at 289 (1994). In the instant case, as mandated by *Schaeffer* and

---

11. Pa.R.A.P.1926 controls the addition of evidence to the certified record. Appellant had the opportunity to request that the Trial Court make the affidavit in support of Wendy Kulenovic's arrest warrant part of the certified record. He also had an opportunity to petition this Court to supplement the record once it had been transmitted for our review; however, he failed to do so.

12. We may affirm the trial court's decision if it is correct on any basis, regardless of the grounds relied upon by the trial judge. *See Commonwealth v. Phinn,* 761 A.2d 176, 180 (Pa.Super.2000), citing *Commonwealth v. Garcia,* 746 A.2d 632 (Pa.Super.2000).

*Brion,* the tape recorded conversations were suppressed. As explained above, however, Wendy Kulenovic was not arrested based on the information gained from the tape recorded conversations. Thus, her arrest was not tainted by the illegality of the electronic surveillance.

¶ 20 In *Bannister, supra,* the defendant was convicted on drug charges after the Commonwealth obtained information through use of electronic surveillance without prior determination of probable cause to support the use of the electronic surveillance. Based on the information obtained through the use of the electronic surveillance, the police obtained a search warrant and seized illegal drugs. Relying on *Schaeffer,* the defendant argued that trial counsel was ineffective for failing to move to suppress the evidence obtained through use of the search warrant based upon the illegal electronic surveillance. The Commonwealth in turn argued that *Schaeffer* was inapplicable because the electronically seized communication did not occur in the defendant's home. We noted that whether the defendant resided in the house in question was a key issue not addressed by the defendant's counsel. Ultimately we found that the defendant's ineffectiveness claim had arguable merit and reversed the judgment of sentence and remanded to the trial court for determination of trial counsel's ineffectiveness. After review, we fail to see how this holding supports Appellant's argument.

¶ 21 In *Darush, supra,* a police officer telephoned the defendant at his home and recorded the conversation without first presenting the matter to a neutral judicial authority for a determination of probable cause. During the phone call, the defendant instructed the officer to call him back in twenty minutes at his shop. The officer did so and again recorded the conversation. The trial court suppressed the recorded conversations. Relying on *Schaef-*

*fer* and *Brion,* we affirmed the trial court's decision and held that the defendant's right to privacy was violated by recording the first telephone call without a warrant based upon probable cause. Because the second conversation occurred as a result of the first illegally seized conversation, the recording of the second telephone conversation was suppressed as well. As stated above, in the instant case the illegally tape recorded conversations were suppressed by the Trial Court, but Wendy Kulenovic's statement was not obtained as a result of these conversations.

¶ 22 *Commonwealth v. Brachbill, supra,* differs slightly from the above mentioned cases. In *Brachbill,* an informant consented to allow a police officer to listen on an extension phone to a conversation between the informant and the defendant. A motion to suppress was denied and the officer was permitted to testify at trial as to the content of the conversation. On appeal, our Supreme Court determined that the conversation was illegally intercepted. The evidence was suppressed because the police failed to comply with the statute that requires them to obtain review of the voluntariness of informant's consent by one of the authorities enumerated in 18 Pa.C.S.A. § 5704(2)(ii) of the Wiretap and Electronic Surveillance Act. This case does not support Appellant's argument.

¶ 23 Finally, it is well settled that "a speaker assumes the risk that the person to whom he is speaking will report to the police." *Schaeffer,* 536 A.2d at 368. "The risk of being overheard by an eavesdropper or betrayed by an informer or deceived as to the identity of one with whom one deals is probably inherent in the conditions of human society. It is the kind of risk we necessarily assume whenever we speak." *Id.* at 364, quoting *Lopez v. United States,* 373 U.S. 427, 465–466, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). Appellant and the Kulenovics assumed the risk that

Paul Kuba would report to the police when they admitted their involvement in the murder of Piper Newland. They did not, however, give up their right to choose in the first place to whom they would speak. They did not give up their right to exclude the police from their home. *Id.* at 365. "But if the police are simultaneously recording every word, they are already there, in the home, uninvited, contrary to every reasonable expectation that most people in society still have." *Id.* "No citizen should have to expect that the government may immediately and irrevocably seize his private thoughts every time he voices them to another person." *Id.* at 360. Accordingly, the illegally seized, tape recorded conversations were suppressed, however, the information given orally to the police by Paul Kuba after he left the Kulenovic residence was properly admitted. Such was the risk assumed by the speakers. We find Appellant's argument to be meritless.[13]

■ ¶ 24 Appellant next argues that Paul Kuba's testimony should have been suppressed because it revealed the con-

tents of the illegally tape recorded communications. As explained above, Paul Kuba testified as to his own recollection of the conversations he engaged in with Appellant and the Kulenovics. The contents of the tape recordings were suppressed. Appellant argues that Paul Kuba's testimony was based upon the tape recorded conversations and revealed the contents of the tape recordings because, at Dwayne Kulenovic's trial, Kuba could not recall the details of his conversations with Appellant and the Kulenovics and was permitted to refresh his recollection by reviewing the transcripts of the tape recorded conversations. During cross examination of Paul Kuba at Dwayne Kulenovic's trial, Kulenovic's counsel began to question Kuba in detail about his preliminary hearing testimony by referring to the transcript. In order to avoid a time-consuming cross examination concerning the contents of a transcript with which Kuba was unfamiliar, the trial judge recessed to allow Kuba to review the Kulenovic *preliminary hearing* transcript, not the electronic surveillance transcripts as claimed by Appellant.[14]

**13.** Appellant also argues that the plain language of section 5721.1 of the Wiretap and Electronic Surveillance Act mandates the suppression of Wendy Kulenovic's statement and the evidence obtained as a result of that statement. Section 5721.1 provides that the trial court may exclude the contents of any illegally seized oral communication or evidence derived therefrom. 18 Pa.C.S.A. § 5721.1(b)(6). As explained above, Wendy Kulenovic's statement was not obtained as a result of the illegally seized, tape recorded, oral communications, thus section 5721.1 does not apply in this instance.

**14.** Appellant further contends that Officer Machesky testified at the Dwayne Kulenovic trial that Paul Kuba reviewed the wiretap transcripts prior to his testimony. Officer Machesky's testimony from the Kulenovic trial is not part of the certified record; however, Appellant has attached to his brief what he represents to be the relevant pages of Officer Machesky's testimony from the Dwayne Kule-

novic trial. Although we do not normally consider evidence which is not made part of the certified record, in this limited instance, the validity of the two pages of transcript not challenged by the Commonwealth, we will accept the two pages, 182–183 of Appendix G, as being from the Dwayne Kulenovic trial notes of testimony. Upon review, we disagree that Officer Machesky's testimony supports Appellant's contention. Officer Machesky testified that he believed that Paul Kuba reviewed the wiretap transcripts; however, he did not give the transcripts to Kuba. He testified that he believed Kuba read the transcripts, because he was directed to do so by the Trial Judge, and that he accompanied Kuba to the district attorney's office. N.T. Trial *Commonwealth v. Kulenovic, infra,* at 182–183, as attached to Appellant's Brief Appendix G. As set forth above, Kuba was directed to review the transcript of his preliminary hearing testimony, not the wiretap transcripts. He then testified that he did so, but was unable to recall what he read. Officer

N.T. Trial *Commonwealth v. Kulenovic*, Fayette County No. 769 of 1992, April 15–16, 1993, at 119–22, 132–33, 137.[15] Regardless of what transpired at Dwayne Kulenovic's trial, at Appellant's trial Paul Kuba recounted without aid the substance of his conversation with Appellant. N.T., 5/1/00, at 191–196. He was subsequently thoroughly cross examined regarding his ability to recall the conversations, and responded that he was able to recall the substance of what had been said, but could not recall the specific words used by Appellant. *Id.* at 196–201. We find Appellant's argument that Kuba's testimony was based on a review of the electronic surveillance transcripts to be meritless.

¶ 25 Appellant next contends that the Trial Court erred in denying his motion to dismiss. Appellant argues that prosecutorial misconduct deprived him of a fair trial, therefore double jeopardy prohibits retrial. "The double jeopardy clause of the Pennsylvania constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Commonwealth v. Smith*, 532 Pa. 177, 186, 615 A.2d 321, 325

(1992); *See also Commonwealth v. Mulholland*, 549 Pa. 634, 702 A.2d 1027 (1997), citing *Smith, supra.* "A claim of prosecutorial misconduct must be viewed in light of the entire context in which the alleged misconduct arose." *Commonwealth v. LaCava*, 542 Pa. 160, 189, 666 A.2d 221, 235 (1995).

¶ 26 Appellant claims that in his first trial the Commonwealth intentionally fabricated and/or misrepresented the contents of the electronic surveillance tapes. He claims that the tape introduced at trial, which consisted of excerpts from the original surveillance tapes, revealed Appellant confessing "*I* shot her for the cash, man", but the original tapes, sealed in evidence, reveal an unidentified male voice, not Appellant, stating "*He* shot her for the cash, man." Appellant's Brief at 24. It is Appellant's contention that the statement "I shot her for the cash, man" purportedly made by Appellant, could not have existed on tape absent prosecutorial misconduct, because that statement does not appear on the original surveillance tapes.

¶ 27 On May 1, 2000, a hearing was held on Appellant's motion to dismiss and conflicting testimony was presented regarding the content of the original surveillance tapes. Following the hearing, the Trial Court concluded that Appellant had not

---

Machesky apparently misunderstood the Trial Judge's direction and, as a result, was under the mistaken belief that Kuba reviewed the wiretap transcripts.

**15.** Kuba was not questioned at Dwayne Kulenovic's trial about the contents of the electronic surveillance transcripts or tapes. He was, however, cross examined about the contents of the preliminary hearing transcript. Prior to reviewing the preliminary hearing transcript, Kuba was able to recall without aid the events leading up to the electronic surveillance, including his meeting with Dwayne Kulenovic at the Oasis Bar and his subsequent meeting with the police. He was also able to recall the substance of his conver-

sations with Dwayne Kulenovic during his first visit to Kulenovic's house. After reviewing the preliminary hearing transcript he testified that he had trouble reading due to poor eyesight and education and poor lighting. *Id.* at 133. He testified that it took seven hours for him to read the entire transcript and that he was unable to recall what he read. *Id.* He also mentioned that he had trouble recalling what he read because it was midnight when he was reading and he was tired. *Id.* at 141–42. He later testified that he had some memory of what was said by Dwayne Kulenovic, that he could remember some things but not others, and that some memories came to him when he was questioned. *Id.* at 139.

presented any evidence to support his claim of prosecutorial misconduct. Trial Court Opinion, 5/3/00, at 2. The Trial Court clearly weighted the conflicting testimony in favor of the Commonwealth, and we will not disturb the its credibility determinations. *See Commonwealth v. Fletcher*, 561 Pa. 266, 281, 750 A.2d 261, 269 (2000) (appellate court must defer to credibility determinations of trial court regarding witnesses who appeared before it). After review, we agree that Appellant's claim is meritless, hence the double jeopardy clause was not implicated and the Trial Court properly denied Appellant's motion to dismiss. Accordingly, we affirm the judgment of sentence.

¶ 28 Judgment of sentence affirmed. Jurisdiction relinquished.