## Commonwealth v. Acosta

502

C.P. of Bucks County, no. 00-04238.

*Lisa K. Backentross, senior deputy district attorney* and *Diane E. Gibbons, district attorney,* for plaintiff.

*Michael K. Parlow,* for defendant.

THOMAS, *J.,* February 15, 2001—Pursuant to Pa.R.A.P. 311(d), the Commonwealth appeals the order of this court dated December 4, 2000, granting defendant Miqueas Acosta's motion to suppress. This opinion is filed in accordance with Pa.R.C.P. 1925(a).

At the suppression hearing, the defendant argued that the search was unlawful because it was made pursuant to a pre-textual stop; it was the result of an illegal seizure; the consent given was not voluntary; and because the defendant was incapable of consenting to a search. This court ordered the suppression of all evidence obtained after the stop of the defendant's vehicle because, under the totality of the circumstances, defendant did not give a voluntary consent.

The facts of this case are as follows. On June 16, 2000, Officer John Monaghan was on duty in Bensalem Township, Bucks County, Pennsylvania. N.T., 12/4/00, p. 7. Officer Monaghan was driving southbound on US Route 1 in a marked patrol vehicle when he saw a red, 1992 Ford minivan driven by the defendant Miqueas Acosta. N.T., 12/4/00, pp. 8-9, 17. As Officer Monaghan began to pass the minivan, he noticed that the defendant changed the manner in which he was driving by straightening up, putting both hands on the steering wheel and refusing to look at the officer. N.T., 12/4/00, pp. 10-11.

After Officer Monaghan passed the defendant, he radioed the New York tag of the minivan into police headquarters in order to determine whether the tag was valid. N.T., 12/4/00, p. 12. Police headquarters informed him that the license plate for defendant's vehicle had been

suspended. N.T., 12/4/00, p. 12. Officer Monaghan then activated his car's overhead lights and pulled the defendant over to the right-hand side of the road. N.T., 12/4/00, p. 13.

Officer Monaghan approached the minivan and asked the sole occupant for his driver's license, registration and insurance information. N.T., 12/4/00, p. 14. The defendant gave the officer a valid registration and insurance card and responded that he did not have his driver's license. N.T., 12/4/00, p. 14. When asked for any form of identification, the defendant produced a *BJ's Wholesale Club* card, displaying his picture and name. N.T., 12/4/00, p. 15.

When the officer informed the defendant that the name on the ID did not match the name on the registration and insurance card, the defendant stated that his brother owned the vehicle. N.T., 12/4/00, p. 17. The defendant also orally provided the officer with two conflicting dates of birth and could not produce any identification reflecting his date of birth. N.T., 12/4/00, p. 18. When Officer Monaghan asked him whether he was licensed, the defendant said he had a Minnesota driver's license. N.T., 12/4/00, p. 19.

Officer Monaghan went back to his patrol car and called in the information regarding the defendant's name and the two dates of birth. N.T., 12/4/00, p. 19. The officer was unable to obtain any licensing information for the defendant. N.T., 12/4/00, p. 19. However, he did ascertain that a subject with a different first name and the same last name was wanted in Wisconsin for writing bad checks.[1] N.T., 12/4/00, p. 21. The information Officer

1. Further investigation revealed that the defendant was not the subject wanted in Wisconsin. N.T., 12/4/00, p. 67.

Monaghan received also included a general physical description of the wanted subject, which was fairly similar to that of the defendant. N.T., 12/4/00, p. 21.

Upon receiving this information, Officer Monaghan radioed for assistance. N.T., 12/4/00, p. 22. He then approached the minivan and ordered the defendant to leave his vehicle. The defendant complied without incident. N.T., 12/4/00, pp. 23, 57. Officer Monaghan led the defendant to the rear of the minivan along the curb line of the highway. N.T., 12/4/00, p. 58. He repeated the questions he had asked previously regarding licensure and ownership of the vehicle. N.T., 12/4/00, p. 24. Officer Monaghan also asked additional questions which revealed that the defendant was travelling from New York to take the minivan to someone in Philadelphia. N.T., 12/4/00, pp. 24-25. At some point during this conversation, Officer Dennis Hart arrived on the scene in full uniform and in a marked patrol car. N.T., 12/4/00, pp. 23-24, 28.

Officer Monaghan then informed the defendant that the police were having trouble with drug trafficking on that highway. N.T., 12/4/00, pp. 26-27. He asked the defendant whether he had any weapons or narcotics in the vehicle. N.T., 12/4/00, p. 27. When the defendant said "no," Officer Monaghan asked the defendant whether he would allow him to search the vehicle. N.T., 12/4/00, p. 27.

Although the defendant acquiesced in the officer's request, that request was made while the officer retained the registration, insurance card, and the ID card. N.T., 12/4/00, p. 70. The officer never indicated in any way

that the defendant was free to leave before he requested consent. N.T., 12/4/00, p. 70. The officer acknowledged that he was not certain whether he would have permitted the defendant to leave the scene had he attempted to do so. N.T., 12/4/00, p. 64. Furthermore, the entire conversation was in English.

When the consent was requested, the defendant was standing in front of one of three police vehicles on the scene with their overhead lights activated. N.T., 12/4/00, pp. 29, 67. Additionally, three officers—Officer Monaghan and Officer Hart and Officer Derek Goldstein—stood next to each other in close proximity to the defendant when consent was requested. N.T., 12/4/00, p. 29. The defendant was not provided with any consent forms advising him that he had a right not to consent and he did not give a written consent. N.T., 12/4/00, pp. 30, 62. In short, he was never advised in any way that he was free not to consent to the search. N.T., 12/4/00, p. 62.

Officer Monaghan and Officer Goldstein searched the defendant's vehicle while Officer Hart stood directly next to the defendant and watched him. N.T., 12/4/00, p. 64. During this initial search, the officers did not discover any drugs. N.T., 12/4/00, p. 66.

Shortly thereafter, Officer Christine Kelliher arrived on the scene with a drug-sniffing dog named Cosmo. N.T., 12/4/00, p. 31. Up until this point in time, the defendant was still standing with Officer Hart along the curbside near the passenger's side of the patrol vehicle. N.T., 12/4/00, pp. 40, 69. But when the dog arrived, the defendant was placed in the back seat of Officer

Monaghan's patrol car. N.T., 12/4/00, pp. 31, 40. Officer Monaghan stated that the defendant was moved for "safety reasons," although the officer testified that Cosmo was not a vicious dog, albeit it was "playful in nature" and would jump up. N.T., 12/4/00, pp. 31-32, 40, 69. However, at all times, the dog was leashed and under the control of Officer Kelliher. N.T., 12/4/00, p. 69.

While the defendant was in the back seat of the patrol vehicle, Officer Monaghan, Officer Goldstein, Cosmo and narcotics Officer Gross searched the minivan for a second time. N.T., 12/4/00, p. 66. As a result of the second search, narcotics were found in a steel compartment built into the rear bench of the vehicle. N.T., 12/4/00, pp. 42-43. The defendant was then handcuffed and advised he was under arrest. N.T., 12/4/00, p. 69. At this point, 45 minutes had elapsed since the initial stop. N.T., 12/4/00, p. 72.

Although the defendant was Hispanic and later in the investigation Officer Monaghan felt the need to request that Officer Nieves advise the defendant of his *Miranda* rights in Spanish, nonetheless all conversations with the defendant at the scene were conducted in English. The defendant told Officer Nieves that he "knew English a little bit" but was more comfortable speaking in Spanish. N.T., 12/4/00, p. 77.

In *Commonwealth v. Strickler,* 563 Pa. 47, 757 A.2d 884 (2000), the Supreme Court of Pennsylvania set forth the requirements for a valid consensual search, incident to a traffic stop, indicating that the central Fourth Amendment inquiries in consent cases entail assessment of the constitutional validity of the citizen-police encounter

giving rise to the consent, and, ultimately, the voluntariness of consent. Where the encounter is a valid one, voluntariness becomes the sole focus. If an illegal seizure precedes the consent search, the Commonwealth must also establish a break in the causal connection between the illegality and the evidence thereby obtained. 563 Pa. at 57, 757 A.2d at 888-89.

In the instant case, the court concluded that the encounter preceding the search was a valid one. If a police officer establishes that an actual violation of the Vehicle Code occurred prior to stopping a vehicle or that a reasonable basis supported his belief that the code was being violated, the stop of the vehicle is legal. *Commonwealth v. Andersen,* 753 A.2d 1289, 1293 (Pa. Super. 2000). Officer Monaghan was justified in stopping the defendant because the license plate for the vehicle had been suspended.

The initial stop, however, was never followed by a termination of the encounter before consent was given. Instead, there was a continuous investigative detention throughout the entire time Officer Monaghan and the defendant were together. An investigative detention subjects an individual to a stop and a period of detention but may not be so coercive as to constitute the functional equivalent of an arrest. *Strickler,* 563 Pa. at 58, 757 A.2d at 889. In other words, an investigative detention involves seizure of the person. *Id.*

The determination of whether a seizure, and thus an investigative detention, has been effected in the first instance is made by examining the totality of the circumstances to determine whether a reasonable person would

feel free to leave. *Commonwealth v. Freeman,* 563 Pa. 82, 88, 757 A.2d 903, 906 (2000). In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. *Strickler,* 563 Pa. at 58, 757 A.2d at 890.

Factors relevant to such an assessment include: the existence and nature of any prior seizure; whether there was a clear and expressed endpoint to any such prior detention; the character of police presence and conduct in the encounter under review (for example—the number of officers, whether they were uniformed, whether police isolated subjects, physically touched them or directed their movement, the content or manner of interrogatories or statements, and "excesses" factors stressed by the United States Supreme Court); geographic, temporal and environmental elements associated with the encounter; and the presence or absence of express advice that the citizen-subject was free to decline the request for consent to search. In general, a full examination must be undertaken of all coercive aspects of the police/citizen interaction. *Strickler,* 563 Pa. at 72-78, 757 A.2d at 898-900.

The character of the interaction subsequent to Officer Monaghan's contacting headquarters regarding the defendant's name support the conclusion that the defendant was subject to a continuous seizure which was never terminated. The officer's actions were consistent with a finding that the defendant was seized, as he: radioed for backup; ordered the defendant out of his vehicle; directed the defendant's movements; questioned the defendant about licensure and intended whereabouts; never told the

defendant he was free to leave; and withheld the defendant's documentation. Officer Monaghan's actions would clearly lead a reasonable person to believe that he was not free to leave. Therefore, at all times, the defendant was subject to a Fourth Amendment seizure. See *Freeman,* 563 Pa. at 88-89, 757 A.2d at 907.

Having concluded that the defendant was "seized" at the time his consent was requested, the question is whether the seizure was lawful. To maintain constitutional validity, an investigative detention must be supported by a reasonable and articulable suspicion that the person is engaged in criminal activity. The detention "may continue only so long as is necessary to confirm or dispel such suspicion." *Strickler,* 563 Pa. 58, 757 A.2d at 889 (2000); *Commonwealth v. Lewis,* 535 Pa. 501, 508, 636 A.2d 619, 623 (1994). "The question of whether reasonable suspicion existed at the time of a detention must be answered by examining the totality of the circumstances to determine whether there was a particularized and objective basis for suspecting the detainee of criminal activity." *Freeman,* 563 Pa. at 90, 757 A.2d at 908.

The record shows that Officer Monaghan possessed a reasonable suspicion of criminal activity. The defendant provided conflicting identifying information. He was also unclear as to the owner of the vehicle. N.T., 12/4/00, p. 23. Information regarding the defendant's destination was vague. N.T., 12/4/00, p. 24. Additionally, Officer Monaghan testified that the route the defendant was travelling on was heavily traveled by drug dealers. N.T., 12/4/00, pp. 26-27. See *e.g., Com. v. Francis,* 700 A.2d 1326, 1329 (Pa. Super. 1997) (trooper who had made valid traffic stop had reasonable grounds to suspect that criminal

activity was afoot and request for permission to search the vehicle was not an unlawful seizure, where motorist dropped three cards back into the trunk while freely displaying the other cards to the trooper, and motorist had inconsistent identification and was driving a vehicle with a plate that belonged to another vehicle).

This finding, however, does not in any way justify a search of the defendant's vehicle if the search was pursuant to involuntary consent. "[T]he Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances." *Strickler,* 563 Pa. at 79, 757 A.2d at 901. "Since both the tests for voluntariness and for a seizure centrally entail an examination of the objective circumstances surrounding the police/citizen encounter to determine whether there was a show of authority that would impact upon a reasonable citizen-subject's perspective, there is a substantial, necessary overlap in the analyses." *Strickler,* 563 Pa. at 79, 757 A.2d at 901-902. Consequently, the reasons supporting the conclusion that the defendant was "seized" at the time that he lent his consent to the vehicle search also support a determination that his consent was not voluntary. See *Strickler,* 563 Pa. at 79, 757 A.2d at 902.

The existence of a prior, lawful detention is a factor "engrafting" a degree of coercion upon the encounter. See *Strickler,* 563 Pa. at 76, 757 A.2d at 900. Temporal and geographic elements of an interaction, such as numerous officers with marked patrol cars with flashing lights standing a few feet from a defendant, enhance the

coercive aspects to a degree. *Id.* The withholding of documents, such as registration, works against a finding that consent is voluntary. See *Commonwealth v. Lopez,* 415 Pa. Super. 252, 609 A.2d 177 (1992), *alloc. denied,* 533 Pa. 598, 617 A.2d 1273 (1992).

The absence of an express endpoint to a detention in the form of an admonition by the officer that the defendant is free to leave is also a factor. *Strickler,* 563 Pa. at 77, 757 A.2d at 900. The knowledge of the right to refuse to consent to the search is an additional consideration. *Strickler,* 563 Pa. at 79, 757 A.2d at 901.

All of these factors were present in the instant case. The defendant was detained throughout the entire stop. The defendant was ordered out of his vehicle and his movements were controlled by the officer when he was initially led near the passenger side of the police car and later placed in the back seat of that police car. Officer Monaghan radioed for backup and the officers who arrived on the scene in response to the call were standing close-by to the defendant with the lights on their patrol cars turned on when consent was requested. The defendant was never told he was free to leave but, instead, was under questioning up until the time the consent was requested. None of the documentation the defendant handed over was ever returned. He was never told he was free to refuse to consent to the search. These factors are to some extent magnified by the fact that the officer recognized that it was necessary to warn the defendant of his rights in Spanish and that there was at least some question as to the defendant's proficiency in English. See *Strickler,* 563 Pa. at 79, 757 A.2d at 901 ("the maturity, sophistication and mental or emotional state of the de-

fendant (including age, intelligence and capacity to exercise free will) are to be taken into account" in the determination of whether voluntary consent was given). In light of the aforementioned, this court found that the consent given was not the product of an essentially free and unconstrained choice and was thus involuntary.

It is for the above reasons that the defendant's motion to suppress was granted.