J-S59015-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| CUE ROCKEYMORE, | : | |
| | : | |
| Appellant | : | No. 2870 EDA 2013 |

Appeal from the Judgment of Sentence Entered October 9, 2013,
In the Court of Common Pleas of Philadelphia County,
Criminal Division, at No. CP-51-CR-0009110-2013.

BEFORE:  SHOGAN, J., LAZARUS, J. and STRASSBURGER, J.*

MEMORANDUM BY SHOGAN, J.:                **FILED DECEMBER 02, 2014**

Appellant, Cue Rockeymore, appeals from the judgment of sentence

entered following his conviction of firearms violations.  We affirm.

The trial court summarized the procedural history of this case as

follows:

> Appellant, Cue Rockeymore, was found guilty following a
> waiver trial on October 9, 2013 of Firearms Not To Be Carried
> Without License (18 Pa.C.S.A. § 6106 §§A1) and Carrying
> Firearms in Public in Philadelphia (18 Pa.C.S.A. § 6108).  Prior to
> trial, defense counsel litigated a motion to suppress which was
> denied. Commonwealth presented the testimony of Police
> Officers Sean McKnight and Thomas Bellon as well as a
> certificate of non-licensure and a ballistician's report.  Defense
> presented no testimony but did move into evidence a map and
> picture of the place of arrest.  Appellant was sentenced to a time
> in [sic] to twenty-three (23) months of county incarceration
> followed by three (3) years reporting probation, concurrent on
> each charge.

_____
*Retired Senior Judge assigned to the Superior Court.

Appellant filed a timely notice of appeal on October 11, 2013. This Court entered an Order pursuant to Pa.R.A.P. 1925(b) directing Appellant to file and serve a concise statement of errors complained of on appeal within twenty-one (21) days. After granting an extension of time, Appellant filed a 1925(b) statement on December 20, 2013.

Trial Court Opinion, 1/16/14, at 1. The trial court filed an opinion pursuant to Pa.R.A.P. 1925(a) on January 16, 2014.

Appellant presents the following issue for our review:

Did not the lower court err when it denied [A]ppellant's motion to suppress where two police officers seized the appellant, who was merely walking down the street, without reasonable suspicion or probable cause and therefore, their subsequent recovery of a firearm from him was the fruit of an illegal seizure?

Appellant's Brief at 3.

"When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate." *Commonwealth v. Foglia*, 979 A.2d 357, 360 (Pa. Super. 2009) (*en banc*). "Where the Commonwealth prevailed on the suppression motion, we consider only the evidence of the prosecution and so much of the defense that remains uncontradicted." *Commonwealth v. Cooper*, 994 A.2d 589, 591 (Pa. Super. 2010).

> With respect to factual findings, we are mindful that it is the sole province of the suppression court to weigh the credibility of the witnesses. Further, the suppression court judge is entitled to believe all, part or none of the evidence presented.

*Commonwealth v. Swartz*, 787 A.2d 1021, 1023 (Pa. Super. 2001) (*en banc*). To the extent that the suppression court's factual findings are supported by the record, "we are bound by those facts and will only reverse if the legal conclusions are in error." **Cooper**, 994 A.2d at 591. As an appellate court, it is our duty "to determine if the suppression court properly applied the law to the facts." **Commonwealth v. Maldonado**, 14 A.3d 907, 910 (Pa. Super. 2011) (citation omitted).

Appellant argues that the trial court erred in denying his motion to suppress the gun that the Officers recovered from him. Appellant's Brief at 16. Appellant maintains that he was seized when the Officers approached him, positioning themselves on either side of Appellant, and that the Officers "did not have reasonable suspicion to seize" Appellant. **Id.** at 10. Appellant also contends that the Officers did not have reasonable suspicion justifying an investigative detention. **Id.** at 15. As a result, Appellant maintains that the gun was recovered as a result of an unlawful seizure, and thus should be suppressed as fruit of the poisonous tree. **Id.** at 16.

Contacts between the police and citizenry fall within three general classifications:

> The first [level of interaction] is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or to respond. The second, an "investigative detention" must be supported by a reasonable suspicion; it subjects a suspect to a stop and a period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of an arrest. Finally an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Goldsborough*, 31 A.3d 299, 305 (Pa. Super. 2011).

> To guide the crucial inquiry as to whether or not a seizure has been effected, the United States Supreme Court has devised an objective test entailing a determination of whether, in view of all surrounding circumstances, a reasonable person would have believed that he was free to leave. In evaluating the circumstances, the focus is directed toward whether, by means of physical force or show of authority, the citizen-subject's movement has in some way been restrained. In making this determination, courts must apply the totality-of-the-circumstances approach, with no single factor dictating the ultimate conclusion as to whether a seizure has occurred.

*Commonwealth v. Lyles*, 54 A.3d 76, 79-80 (Pa. Super. 2012).

An investigative detention must be supported by reasonable suspicion, which is a less stringent standard than probable cause. *Foglia*, 979 A.2d at 360. "In order to determine whether the police had reasonable suspicion, the totality of the circumstances - the whole picture - must be considered." *Commonwealth v. Simmons*, 17 A.3d 399, 403. Given the totality of the circumstances, "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Id.* (quoting *Unites States v. Cortez*, 449 U.S. 411, 417-418

-4-

(1981)). "[W]e must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience." *Commonwealth v. Kemp*, 961 A.2d 1247, 1255 (Pa. Super. 2008) (*en banc*) (citation and quotation marks omitted). Furthermore:

> the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Hughes*, 908 A.2d 924, 927 (Pa. Super. 2006) (citations and internal quotations omitted). Additionally, suspicious behavior of the suspect may ultimately provide reasonable suspicion that justifies an investigative detention. *Foglia*, 979 A.2d at 360-361. We have clarified the type of observable behavior that would be relevant to this inquiry:

> Evasive behavior also is relevant in the reasonable suspicion mix. [*Illinois v.*] *Wardlow*, [528 U.S. 119 (2000)]; *accord Commonwealth v. Freeman*, 563 Pa. 82, 757 A.2d 903, 908 (2000) ("nervous, evasive behavior such as flight is a pertinent factor in determining reasonable suspicion"). Moreover, whether the defendant was located in a high crime area similarly supports the existence of reasonable suspicion. *Wardlow, supra*. Finally, if a suspect engages in hand movements that police know, based on their experience, are associated with the secreting of a weapon, those movements will buttress the legitimacy of a protective weapons search of the location where the hand movements occurred. *In Interest of O.J.,* 958 A.2d 561 (Pa. Super. 2008) (*en banc* ).

*Id.* at 361. "Evidence obtained from an unreasonable search or seizure is inadmissible at trial." *Commonwealth v. Campbell*, 862 A.2d 659, 663 (Pa. Super. 2004).

Additionally, based upon the exception to the prohibition of warrantless searches and seizures carved out by the United States Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 30 (1968):

> [w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others the officer may conduct a pat down search to determine whether the person is in fact carrying a weapon. *Terry*, [392 U.S. at 24]. The purpose of this limited search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence. *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972).

*Simmons*, 17 A.3d at 403 (internal quotation marks omitted). "To justify a frisk incident to an investigatory stop, the police need to point to **specific and articulable** facts indicating the person they intend to frisk may be armed and dangerous; otherwise, the talismanic use of the phrase 'for our own protection[]' … becomes meaningless." *Cooper*, 994 A.2d at 593 (citation and quotation omitted; emphasis in original). We are "guided by common sense concerns, giving preference to the safety of the officer during an encounter with a suspect where circumstances indicate that the suspect may have, or may be reaching for, a weapon." *Commonwealth v. Mack*, 953 A.2d 587, 590 (Pa. Super. 2008).

In the case *sub judice*, Officer McKnight testified that he and his partner were driving southbound on 2nd Street in the City of Philadelphia on the night in question at approximately 12 a.m. N.T., 10/9/13, at 6-7. Officer McKnight's attention was drawn to Appellant because he "observed [Appellant] adjust an object in the center of his waistband and then pin his right arm against his body and not move his arm, but he continued walking." *Id.* at 8. Officer McKnight explained that the area was well lit and that he was approximately seven to eight feet from Appellant when he observed him. *Id.* at 8. After seeing Appellant grab the object in his waistband, the officers circled the block in their patrol car. *Id.* at 8-9. After coming back around to 2nd Street, Officer McKnight testified that Appellant was still walking on the sidewalk of 2nd Street. *Id.* at 9. The officers then parked and exited the vehicle. *Id.* As they were exiting the vehicle, Appellant "froze" on the sidewalk. *Id.* Neither officer told Appellant to stop nor did they draw their weapons on Appellant. *Id.* at 10.

Officer McKnight further testified that after Appellant stopped and "pretty much as soon as my partner stepped up onto the sidewalk," Officer McKnight's partner yelled "gun." N.T., 10/9/13, at 10. At that point, the officers secured Appellant and Officer Bellon recovered a silver revolver loaded with six live rounds from the center of Appellant's waistband. *Id.* at 10-11.

Officer McKnight also explained that the area of 3200 North 2nd Street is a "very violent area. High crime, like high narcotics, high gun area, definitely." N.T., 10/9/13, at 11. Officer McKnight stated that he had previously made arrests related to guns or shootings in that area. *Id.* Officer McKnight also testified that at the time of the incident, he was in the process of transporting a prisoner who was a suspect in an unrelated shooting that had occurred two to three blocks away from where Appellant was stopped. *Id.* at 11-12.

Officer Bellon also testified. N.T., 10/9/13, at 23-38. Officer Bellon testified that on June 29, 2013, at approximately 12:10 a.m., he was on duty with Officer McKnight and they were in the area of 3200 North 2nd Street in Philadelphia. *Id.* at 24. The Officers had just left the scene of a nearby shooting and were transporting a suspect from that shooting when they turned southbound onto 2nd Street and observed a male, identified as Appellant, walking northbound on 2nd Street. *Id.* at 25. Officer McKnight alerted Officer Bellon that Appellant "had reached for his waistband and then bladed his arm against his waistband." *Id.* After circling the block in their vehicle, the officers parked their car in front of Appellant's location on the sidewalk. *Id.* Officer Bellon exited the vehicle and explained: "[a]s I approached the sidewalk, [Appellant] froze. He wouldn't move." *Id.* Officer Bellon testified that upon his exiting the car and approaching Appellant, the

officer did not say anything to Appellant to cause Appellant to stop. *Id.* at 25. Officer Bellon provided the following summary of his subsequent interaction with Appellant:

> [A]s I approached [Appellant], I observed a silver firearm with a wooden handle in his waistband between his blazer and his orange polo shirt; the same one he's wearing right now. At that point I went to secure [Appellant]. He made a reaching movement towards the weapon. We then secured him against the wall. I then recovered the firearm, which was a .38 Smith & Wesson long, with a serial number -- if I may refer to my notes -- 707471, which was loaded with six live rounds and it was placed on a Philadelphia property receipt.

*Id.* Officer Bellon testified that the actions of his stepping onto the sidewalk and seeing the gun in Appellant's waistband were simultaneous. *Id.* at 36.

Officer Bellon explained that after securing the gun, Appellant stated that he did not have a permit to carry it. N.T., 10/9/13, at 36. Appellant told the officers that he "had just found the gun in a lot." *Id.* Upon the officers checking NCIC, they confirmed that Appellant did not have a permit to carry the firearm. *Id.*

Thus, evidence of record establishes that, given the totality of the circumstances, the detaining officers had a particularized and objective basis for suspecting Appellant was involved in criminal activity. Based on their experience, the officers knew the area in which Appellant was walking to be a high crime area where shootings were not uncommon. In fact, when officers observed Appellant, they were transporting an individual who had

just been involved in an unrelated shooting approximately two-to-three blocks from where Appellant was walking. Based also on their experience was their suspicion that Appellant may be carrying a gun, due to Appellant's behavior of grabbing an object at his waistband and "blading" his arm against his side. Accordingly, the officers had reasonable suspicion to stop Appellant and further investigate whether he possessed a weapon that he did not have a permit to carry.

Upon stopping their vehicle near Appellant, the officers exited the vehicle. The testimony reflects that as soon as the officers stopped the vehicle, Appellant "froze" on the sidewalk of his own accord. Neither officer directed Appellant to "stop," drew their weapons, or tried to restrict Appellant's movement. The officers were approaching Appellant for purposes of investigating whether he had a gun. Thus, we cannot agree with Appellant's argument that he was "seized" at that point. *See Cooper*, 994 A.2d at 592 (holding that a seizure does not occur simply because a police officer approaches an individual with the intention of asking that individual questions).

Furthermore, Officer Bellon testified that simultaneously with his stepping onto the sidewalk to approach Appellant, he saw that Appellant indeed had a gun tucked in his waistband. At that point, Officer Bellon alerted his partner that Appellant had a gun, and the officers moved in to

secure Appellant and the gun. The officers were justified in obtaining the gun during this investigative stop pursuant to the protections of **Terry**. **Simmons**, 17 A.3d at 403.

Furthermore, after the officers had secured the gun, Appellant stated that he did not have a permit for the weapon. At that point, the officers had probable cause to arrest Appellant for the VUFA violations.

Thus, contrary to Appellant's claims, the officers did not unlawfully stop or seize Appellant. The gun was not unlawfully obtained and need not be suppressed as fruit of the poisonous tree. Accordingly, the trial court properly denied Appellant's motion to suppress the weapon that the officers retrieved from Appellant.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/2/2014