J-S59006-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ABDUL ARCHER | : | |
| | : | |
| Appellant | : | No. 1099 EDA 2018 |

Appeal from the Judgment of Sentence March 23, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0002293-2017

BEFORE:  LAZARUS, J., NICHOLS, J., and McLAUGHLIN, J.

MEMORANDUM BY LAZARUS, J.:                **FILED NOVEMBER 21, 2019**

Abdul Archer appeals from the judgment of sentence, entered in the

Court of Common Pleas of Philadelphia County, after the Honorable Susan I.

Schulman convicted him, following a nonjury trial, of numerous violations of

the Uniform Firearms Act ("VUFA").[1]  On appeal, Archer challenges the denial

of his motion to suppress.  After careful review, we affirm.

The trial court set forth the facts of this matter as follows:

> [T]he Commonwealth presented the testimony of Philadelphia
> Police Officers Janel Craig ("Officer Craig") and Christopher
> Fernandez ("Officer Fernandez").  Officer Craig testified that
> around 1:00 p.m. on January 31, 2017, she and another officer,
> Officer Linquest, were patrolling the area of 2700 West Sedgley
> Avenue in the [C]ity and [C]ounty of Philadelphia, Pennsylvania.
> In this vicinity, Officer Craig observed a black male—i.e.,

---

[1] **See** 18 Pa.C.S.A. §§ 6101-6128.  Specifically, Archer was convicted of
persons not to possess firearms, 18 Pa.C.S.A. § 6105; firearms not to be
carried without a license, 18 Pa.C.S.A. § 6106; and carrying firearms on the
public streets of Philadelphia, 18 Pa.C.S.A. § 6108.

[Archer]—driving directly in front of her in a silver Kia Amanti. Officer Craig recognized the vehicle from her prior foot beat experience in that neighborhood and believed it belonged to [Archer], whom Officer Craig had stopped as a pedestrian multiple times pursuant to roll call complaints.

It appeared to Officer Craig that [Archer] was about to drive through the red light of an approaching intersection but then "slammed on his brakes" upon observing the patrol car behind him. Once [Archer] slammed on his brakes, Officer Craig slammed on her brakes to prevent a collision. With her attention now focused on [Archer's] vehicle, Officer Craig followed [Archer] for nearly two blocks and checked his vehicle's tags with the Philadelphia Crime Information Center/National Crime Information Center ("PCIC/NCIC"). All the while, [Archer] continually peered at Officer Craig through his vehicle's rearview and sideview mirrors.

The PCIC/NCIC check revealed that the vehicle's registration had expired and that the vehicle's owner was an individual named "Shervon Banks." Because driving a vehicle with an expired registration violated the [M]otor [V]ehicle [C]ode, Officer Craig conducted a vehicle stop. Before exiting her patrol car, Officer Craig observed that:

> Prior to exiting the vehicle, I made several observations of [Archer] in the vehicle. I observed that he was continuously look[ing] through his rearview, his side mirror. He was reaching down at the floor area-what looked like the floor area. But I could just see him dipping down multiple times towards the passenger seat floor area and adjusting in his seat.

Because [Archer's] movements convinced her that danger may be afoot, and because her temporary partner (Officer Linquest) was a rookie, Officer Craig used her cell phone to call her regular day-to-day partner, Officer Fernandez, for backup.

After speaking with Officer Fernandez, Officer Craig exited her patrol car and approached the driver's side of [Archer's] vehicle. Officer Craig asked [Archer] for his license, registration, and insurance information. Officer Craig testified that [Archer] was very nervous and his voice was shaky. Upon receiving [Archer's] license and other vehicle documentation, Officer Craig returned to her patrol car and awaited the arrival of Officer Fernandez. She

- 2 -

informed Officer Fernandez of [Archer's] nervous behavior and irregular maneuvering inside the vehicle.

Officer Fernandez testified that on the above date and time he received a call from Officer Craig about a vehicle stop a few blocks from where he was patrolling. Officer Fernandez and his temporary partner, Officer Matthews, responded to the location within two minutes. Officer Fernandez testified that the location was a "high crime area with firearms and a lot of shootings." In fact, only a few blocks from the location was a police-designated "grid" area, where police post two permanent cars "on a block-to-block radius 24/7 just because there's a lot of shootings."

Upon arrival, Officer Fernandez was told by Officer Craig that she recognized [Archer] from prior pedestrian stops, and that [Archer] was moving around a lot in the vehicle and was very nervous. Officer Fernandez approached [Archer's] vehicle and initially tried to relax [Archer] by "joking around" with him. Officer Fernandez then asked [Archer] whether there was anything in the vehicle that [he] should know about, and [Archer] replied "no." Officer Fernandez also asked [Archer] whether Officer Fernandez could search the vehicle, and [Archer] consented.

Officer Fernandez thereafter requested [Archer] to exit the vehicle. [Archer] quickly stepped outside and began walking past Officer Fernandez, but Officer Fernandez stopped him and asked him to put [his] hands on top of the vehicle. When [Archer] complied and placed his hands on top of the vehicle, he leaned the front of his body directly against the vehicle so as to block Officer Fernandez from accessing the front of his body. Officer Fernandez believed at this point that his safety and the safety of his fellow officers could be compromised so he commenced a pat-down of [Archer's] outer clothing for weapons. Since he couldn't touch the front of [Archer's] pockets because of [Archer's] position, he told [him] to step back. At that point Officer Fernandez felt the exterior of [Archer's] right pants pocket and immediately felt a firearm. Officer Fernandez testified that he possessed the same type of small firearm and thus immediately knew that the object he felt was a gun.

At this point[, Archer] ran. Officer Fernandez gave chase, then fell in the middle of the street but quickly rose, pulled out his taser, told [Archer] to stop multiple times, and yelled "taser, taser, taser." Officer Fernandez then used his taser and "subdued"

> [Archer] on the ground.  Once [Archer] was placed in handcuffs, Officer Craig removed the handgun from [Archer's] pants pocket.

Trial Court Opinion, 1/23/19, at 2-5 (citations to record omitted).

Archer was arrested and charged with the above offenses.  He filed a pre-trial motion seeking to suppress, as "fruit of the poisonous tree," the evidence obtained as the result of Officer Fernandez's frisk.  After a hearing, the trial court denied the motion.  Archer proceeded immediately to a nonjury trial, after which the court convicted him on all charges.  On February 20, 2018, the court sentenced Archer to concurrent terms of 1½ to 3 years' imprisonment, plus five years' consecutive probation, for the convictions under sections 6106 and 6108, and a consecutive 5 year term of probation on the section 6105 conviction.  Archer filed a post-sentence motion challenging the trial court's suppression ruling, which was denied on March 8, 2018.  On March 23, 2018, the trial court, apparently *sua sponte*, entered a new sentencing order, imposing a term of incarceration of 1½ to 3 years on the section 6106 violation, followed by two concurrent 5-year terms of probation on the section 6105 and 6108 violations.[2]

_____

[2] The court amended its sentencing order because the original sentence for Archer's section 6106 conviction exceeded the statutory maximum.  The court issued its amended sentencing order more than 30 days after the imposition of Archer's original judgment of sentence.  **See** 42 Pa.C.S.A. § 5505 (court may modify or rescind order within 30 days after its entry).  However, notwithstanding section 5505, trial courts possess the inherent power to correct obvious and patent errors in their original orders, even absent traditional jurisdiction over their cases.  **See Commonwealth v. Holmes**, 933 A.2d 57 (Pa. 2007) (trial court may correct patently illegal sentence even if it lacks jurisdiction under section 5505).

Archer filed a timely notice of appeal, followed by a court-ordered concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Archer raises a single question for our review:

> Was not the frisk of [Archer] unlawful under both the Fourth Amendment of the United States Constitution and Article 1, Section 8 of the Pennsylvania Constitution, where police lacked reasonable suspicion that [Archer] had committed a crime and that he was armed and dangerous?

Brief of Appellant, at 3.

This Court's well-settled standard of review of a denial of a motion to suppress evidence is as follows:

> [Our review] is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [we are] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to [ ] plenary review.

*Commonwealth v. Jones*, 121 A.3d 524, 526–27 (Pa. Super. 2015) (citation omitted).

Archer claims that neither Officer Craig nor Officer Fernandez "articulated facts that would establish a reasonable suspicion that criminal

- 5 -

activity was afoot or that [] Archer was armed and dangerous." Brief of Appellant, at 12. Archer argues that Officer Craig could not have believed that he was armed and dangerous based on her observations of him, as she interacted with him prior to Officer Fernandez's arrival without asking Archer to exit the vehicle or even to keep his hands on the steering wheel. Archer further argues that Officer Fernandez's testimony does not provide any additional factual basis for a finding of reasonable suspicion. We disagree.

Our Supreme Court has recognized expressly that an officer conducting a valid traffic stop may order the occupants of a vehicle to alight to assure his own safety. *See Commonwealth v. Freeman*, 757 A.2d 903, 907 n.4 (2000), citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) and *Maryland v. Wilson*, 519 U.S. 408, 415 (1997). "If, during the course of a valid investigatory stop, an officer observes unusual and suspicious conduct on the part of the individual which leads him to reasonably believe that the suspect may be armed and dangerous, the officer may conduct a pat-down of the suspect's outer garments for weapons." *Commonwealth v. E.M./Hall*, 735 A.2d 654, 659 (Pa. 1999). *See also Terry v. Ohio*, 392 U.S. 1, 24 (1968) (officer may conduct pat-down for weapons where there are reasonable grounds to believe person may be armed and dangerous). In order to establish reasonable suspicion, the police officer must articulate specific facts from which he or she could reasonably infer that the individual was armed and dangerous. *See Commonwealth v. Gray*, 896 A.2d 601, 606 (Pa. Super. 2006). "The officer need not be absolutely certain that the

individual is armed; the issue is whether a reasonably prudent person in the circumstances would be warranted in the belief that his safety or the safety of others was in danger." **Terry**, 392 U.S. at 27. When assessing the validity of a **Terry** stop, we examine the totality of the circumstances, **see id.**, giving due consideration to the reasonable inferences that the officer can draw from the facts in light of his experience, while disregarding any unparticularized suspicion or hunch. **See Commonwealth v. Zhahir**, 751 A.2d 1153, 1158 (Pa. 2000).

We first note that Officer Craig lawfully pulled Archer over because, after observing him nearly cause an accident, she discovered that he was driving a vehicle with an expired registration. Informed by Officer Craig of Archer's nervous behavior and irregular maneuvers, Officer Fernandez also had the right to ask Archer to step out of the vehicle. **Freeman**, **supra**. Thus, the sole question before us is whether Officer Fernandez had reasonable suspicion to perform the pat-down which resulted in the discovery of the weapon at issue in this case.

In **Commonwealth v. Parker**, 957 A.2d 311 (Pa. Super. 2008), an officer pulled the defendant over for a broken brake light. When stopped behind the vehicle, the officer noticed that the driver, Parker, "began to reach down, dipping his shoulders right and left." **Id.** at 313. This movement caused the officer to believe that the defendant might have been concealing a weapon. After ordering Parker out of the car, the officer performed a pat-down, which resulted in the discovery of objects the officer believed to be

cocaine, as well as a pipe used to smoke cocaine. In affirming the trial court's denial of Parker's suppression motion, we concluded that "the suspicious gestures and movements of Parker could have caused the officer to reasonably conclude, in light of his experience, that Parker was armed and dangerous." *Id.* at 316. We further noted that we "must be guided by common sense concerns that give preference to the safety of the police officer during an encounter with a suspect where circumstances indicate that the suspect may have, or may be reaching for, a weapon." *Id.*, quoting *Commonwealth v. Stevenson*, 894 A.2d 759, 772 (Pa. Super. 2006). Accordingly, we found the police officer did not unlawfully search Parker.

Here, the circumstances warrant a finding of reasonable suspicion even more clearly than in *Parker*. While driving behind Archer, Officer Craig observed him "continuously look[ing] through his rearview mirror, his side mirror. He was reaching down at the floor area—what looked like the floor area. But I could just see him dipping down multiple times towards the passenger seat floor area and adjusting in his seat." N.T. Suppression Motion Hearing, 10/30/17, at 8. When Officer Fernandez arrived on the scene, which he characterized based on his experience as a "[h]igh-crime area with firearms and a lot of shootings," *id.* at 48, Officer Craig relayed her observations to him and advised him that Archer appeared nervous. *Id.* at 22. Officer Fernandez then approached Archer and tried to "make him calm down by joking around with him." *Id.* at 38. Officer Fernandez testified that Archer was "shaky" and "nervous" during their interaction. *Id.* at 49. After Archer

agreed to allow Officer Fernandez to search the vehicle, Officer Fernandez requested that Archer exit the car and place his hands on the hood. In doing so, Archer leaned the front of his body against the vehicle, which prevented Officer Fernandez from reaching his front pockets. Officer Fernandez testified as follows:

> Q. Did the fact that you were at 2700 West Sedgley Avenue factor, at all, as to whether or not you felt that you[r] safety was an issue?
>
> A. Yes. And especially, when he did force his body against the vehicle, that was definitely a big hit for me.

*Id.*

Based upon the totality of circumstances recited above, we conclude that Officer Fernandez's search was justified by a reasonable suspicion that Archer was armed and dangerous. *Terry*, *supra*. The officers were interacting with Archer in a high-crime area where firearms were prevalent; Archer was "shaky," acting nervously and making furtive "dipping" movements. In addition, he tried to prevent Officer Fernandez from accessing his front pockets as if in an attempt to conceal something. The suppression court's factual findings are supported by the record, *Jones*, *supra*, and the court did not err in denying Archer's suppression motion.[3]

---

[3] Archer's reliance on *Commonwealth v. Reppert*, 814 A.2d 1196 (Pa. Super. 2002) (en banc), is misplaced. Unlike the case before us, *Reppert* did not involve a question of the propriety of a *Terry* frisk during the pendency of a vehicle stop. Rather, *Reppert* involved an officer's ability to remove a passenger from a vehicle and order him to empty his pockets while conducting

Judgment of sentence affirmed.

Judge McLaughlin join the Memorandum.

Judge Nichols concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/21/19

---

an investigative detention after the vehicle stop had concluded. Thus, **Reppert** is not controlling.